**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JOHN A. BENDER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Civil Action No. 3:14-CV-2595-L** |
| | § | |
| **DAVID J. SHULKIN, M.D.,** | § | |
| **Secretary of Veteran's Affairs,**[1] | § | |
| | § | |
| **Defendant.** | § | |

**AMENDED MEMORANDUM OPINION AND ORDER**

On March 22, 2017, the court issued a memorandum opinion and order in this case. *See* Doc. 68. The court has discovered a typographical error and, accordingly, hereby **vacates** the March 22, 2017 memorandum opinion and order and **substitutes** this amended memorandum opinion and order in its place. There is no substantive difference between the amended memorandum opinion and order and the one issued yesterday.

Before the court is Defendant's Motion for Summary Judgment (Doc. 43), filed December 28, 2015. After considering the motion, response, reply, summary judgment evidence, record, and applicable law, the court **grants in part** and **denies in part** Defendant's Motion for Summary Judgment.

---

[1] On February 13, 2017, David J. Shulkin, M.D., replaced Robert A McDonald as the Secretary of Veteran's Affairs. Accordingly, the court has altered the caption to reflect that the proper named Defendant is David J. Shulkin, M.D. *See* Fed. R. Civ. P. 25(d), which provides that a public official's successor is automatically substituted as a party.

**Amended Memorandum Opinion and Order - Page 1**

## I.        Factual and Procedural Background

This is an employment discrimination case.  Plaintiff John A. Bender ("Bender"), an African-American male, filed this action on July 18, 2014, against Defendant David J. Shulkin, Secretary, United States Department of Veteran's Affairs ("Defendant" or "VA"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and  the Texas Commission on Human Rights Act ("TCHRA"), Texas Labor Code § 21.001 *et seq.*[2] Bender alleges that Defendant unlawfully discriminated against him based on race, retaliated against him for engaging in protected activity, and subjected him to a hostile work environment.  Bender seeks compensatory and punitive damages, attorney's fees, and costs.  The court now sets forth the evidence, viewed in the light most favorable to Bender, as the nonmovant, and draws all reasonable inferences in his favor.  *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

### A.        Bender's Employment as Patient Safety Manager

Bender began working for the VA in January 2007 as a Patient Safety Manager, grade 13, at the VA's North Texas Health Care System located in Dallas, Texas (hereinafter, "VANTHCS"). VANTHCS is one of four VA Health Care Systems in the state of Texas, all of which are in the geographical boundaries of the VA's Veterans Integrated Service Network 17 ("VISN 17").

As Patient Safety Manager, Bender was supervised by the Medical Director of VANTHCS. Medical Director Joseph Dalpiaz ("Dalpiaz") supervised Bender from 2007 to sometime in 2010. In 2009, Dalpiaz awarded Bender a retention incentive of 15% of his salary and promised him that

---

[2] Texas abolished the Texas Commission on Human Rights in March 2004 and transferred its duties to the Texas Workforce Commission.  The popular appellation for Chapter 21 of the Texas Labor Code, however, is the Texas Commission on Human Rights Act or TCHRA.  **The court, for reasons stated later in this opinion, has serious concerns as to whether Bender, a federal employee, can even assert state law employment discrimination claims against the Veterans Administration and will require further briefing on this matter, as neither party addressed this issue.**

the incentive would be increased to 20% if the Dallas VA achieved certain milestones.  Sometime in 2010, Dalpiaz took a different job position and Mark Doskocil ("Doskocil"), as Acting Medical Director, became Bender's immediate supervisor until in or around the end of September 2011.  In October 2011, Jeffrey Milligan ("Milligan") was hired as the Medical Director of VANTHCS and became Bender's direct supervisor.

### B.      Acting Medical Director Doskocil

In 2010, Doskocil issued Bender a "letter of counseling" based on a complaint against him made by a Caucasian female, Diane Lyle.  Doskocil did not investigate the allegations prior to issuing the "letter of counseling" and raised his voice at Bender during a meeting about the complaint.  Bender believed that Doskocil was discriminating against him based on race, that he would not have issued the "letter of counseling" to a Caucasian employee without first conducting an investigation, and that he would not have raised his voice at a Caucasian employee.  In April 2011, based on these events, Bender filed an Equal Employment Opportunity ("EEO") complaint asserting harassment and race discrimination.  Thereafter, another employee, Sharon Johnson, told Bender that Doskocil was trying to "weed out" African-American employees.  Doskocil learned about the EEO Complaint and was angry.

On May 24, 2011, Doskocil issued Bender a second "letter of counseling," advising him of a complaint by another Caucasian female, Dr. Catherine Orsak.  Doskocil, once again, failed to investigate the complaint prior to issuing the letter.  In July 2011, Bender and the Dallas VA successfully mediated Bender's EEO complaint.  Doskocil was angry during the negotiations and berated Bender for filing an EEO complaint.

In September 2011, Doskocil gave Bender a lower performance rating of "Fully Successful," instead of the "Outstanding" rating he had previously received, justifying the lower rating by pointing out the "letters of counseling." Doskocil had the Dallas VA police stand by when he delivered the lower rating to Bender. Bender believes this lower rating adversely affected his income because it caused him to not receive a bonus in 2011, as only employees with a higher rating that "Fully Successful" were entitled to a bonus.

Doskocil refused to allow Bender to attend the Health Care Leadership Development Program in 2011, telling Bender he could not attend because of Dr. Orsak's prior complaint against him. Near the end of his term as Acting Medical Director, Doskocil made negative statements about Bender to Milligan—the incoming Medical Director and Bender's soon-to-be supervisor—and told him that Bender should be fired. Donald Burrell ("Burrell"), President of the American Federation of Government Employees, Local 2437, who was, until recently, employed by VANTHCS, states in a declaration that he participated in a 2011 meeting with Doskocil, where he learned that "Mr. Milligan had been given orders by Mr. Doskocil to fire John Bender[.]" Pl.'s App. 215-16. Burrell further testifies that Doskocil told him "that he was mad that Mr. Bender had filed an EEO [complaint] against Mr. Doskocil" and "wanted Mr. Bender gone[.]" *Id.*

Doskocil made it difficult for Bender to perform his job duties by not allowing him to fill two open positions in his department, which caused Bender to have to work numerous hours of overtime each day. Bender was not allowed either overtime pay or compensatory time for these hours, although he had received overtime pay when he worked under Dalpiaz. Though there were hiring freezes in place for a period of time, Doskocil eventually allowed other departments to hire, but did

not release the freeze on Bender's department.  Bender's department was the only one not allowed

to fill vacancies during that time period in 2012.

### C.    Medical Director Milligan

Milligan was hostile to Bender during their first meeting and asked Bender to explain why

other members of the "Quad" did not like Bender.  Milligan ordered Bender to conduct individual

meetings with each member of the "Quad."

#### 1.    Racial Slurs

In late 2011, per Milligan's instructions, Bender met with Dr. Clark Gregg ("Gregg"), Chief

of Staff at the VANTHCS.  Dr. Gregg told Bender that Shirley Bealer, Sandra Griffin, and "all the

rest of these niggers" would be gone and that Bender would be next.  Gregg also told Bender he

would kill him if he filed an EEO complaint against him.  *Id.* at 12, 183, 500.

On November 21, 2011, Kenneth Carroll, a staff attorney with the VA Office of Regional

Counsel, called Bender a "house nigger" in front of his peers and supervisors during a morning

meeting of the VA senior leadership team.  Bender describes the incident as follows:

> During the meeting, Carroll had been asked what should be done if the union called
> people names or if the union became disrespectful during a meeting with an
> employee and the union.  In response to the question, Carroll pointed at Bender and
> called him a "house nigger' as an example of what would be an inappropriate
> comment.

*Id.* at 499 (Pl.'s Ans. to First Set of Interrogs. at 12).  In attendance at the meeting were, among

others, Milligan, Human Resources Officer Barbara Rogers ("Rogers"), Associate Director Peter

Dancy ("Dancy"), attorney Curt Martin, Chief of Pharmacy Ruth Bechdol, Florine McCall

("McCall"), Capri Rice ('Rice"), and Bender.  Milligan, Bender's direct supervisor, did nothing to

reprimand Carroll.  Though Milligan denies hearing the racial slur, three other meeting attendees

testify that they heard Carroll call Bender a "house nigger."  McCall heard Carroll call Bender a "house nigger," and states Carroll was "making an analogy" when he said "house nigger," and was using Bender as an example.  Id. at 354.  She also testified at her deposition that the "word is used around here loosely[.]"  Id. at 355.

That same morning, just before the November 21, 2011 meeting, Bender heard Milligan and others discussing a "monkey book."  Rice, an African-American female, later filed an EEO complaint after hearing Carroll call Bender the "house nigger" and after hearing Milligan joke with another employee at the same meeting about a book called "The Monkey," rather than reprimand Carroll for his conduct.

On certain occasions, when Christopher Sandles, an African American-employee, was late to the morning report meeting, Bender heard Milligan ask the group: "Where is that boy Sandles? I am looking for that boy."  Id. at 14, 500.  Bender never heard Milligan refer to any non-African-American employees as "boy."  Id. at 500.

### 2.   Termination of Retention Incentive

In December 2011, Milligan terminated Bender's retention incentive with the termination retroactive to June 2010, contending that the retention incentive had not been properly approved. In contrast to Milligan's declaration, Lawrence Biro ("Biro"), Network Director of VISN 17, testified that he accepted Milligan's decision to terminate Bender's retention incentive because of Bender's low performance rating.

### 3.   Edoghotu's Complaint About Bender

VANTHCS employee Felicia Edoghotu ("Edoghotu") filed an EEO complaint on September 2, 2011, alleging hostile and offensive behavior toward her by Bender when she was his subordinate

at VANTHCS, including allegations that Bender approached her aggressively about work matters and would call her into his office to yell at her and berate her once or twice per month.  Def. App. 123-37.  She also alleged retaliatory harassment by Bender based on her prior EEO activity.  *Id.*  On March 7, 2014, after holding an administrative hearing, Administrative Law Judge ("ALJ") Veronica Cuadra issued a decision finding in favor of Edoghotu and holding the VA vicariously liable "for sex- and reprisal-based hostile environment."  *Id.* at 137.  Following the ALJ's decision, the parties negotiated a settlement and the ALJ issued a procedural decision dismissing the complaint.  *Id.* at 120.  Bender contends that the VA did not adequately defend him from Edoghotu's complaint. Sandra Cawley defended the VA in the proceeding but did not meet with Bender to prepare him for the hearing and introduced none of the documentary evidence that supported the VA's position.

### 4. *Bender's Suspension and Temporary Detail*

When the ALJ's ruling was issued, Edoghotu no longer reported directly to Bender.  She had been moved out of his department before the hearing was held.  Even though she no longer reported to him, the VA's counsel, Michael Anfang and Kurt Martin, and Human Resources Officer Rogers decided to strip Bender of all supervisory duties.  These individuals knew of Bender's prior EEO complaints.  Milligan recused himself from the process but knew what occurred because he was a participant in e-mail threads on the subject.  These employees, knowing that Edoghotu no longer worked for Bender, instructed Associate Director Peter Dancy ("Dancy") to put Bender on administrative leave immediately.  Dancy admits that the decision to put Bender on leave was not his decision, although he signed the letter that placed Bender on leave.  Bender was instructed to leave the VA premises immediately and not to return until so instructed.  VA police officers were nearby and closely watched as Bender left the premises.

On March 28, 2014, after two weeks on paid administrative leave, Bender was summoned to report to Dancy's office  At that meeting, Dancy advised Bender that he was going to be temporarily detailed to a GS-12 position.[3]   On March 31, 2014, Dancy issued Bender a letter formalizing the decision to detail him to the Administrative Officer position in the Physical Medicine and Rehabilitation Service ("PM&R"), a position with no supervisory duties.  The detail had no impact on Bender's pay.  In this position, Bender reports to Dr. Weibin Yang.  At his deposition, Dancy stated that the justification for moving Bender out of a supervisory role was so that he would no longer supervise the employee who had complained about him.  Dancy admitted at his deposition that he was not made aware that Edoghotu no longer worked for Bender at the time he was moved to PM&R.  Although this assignment was classified as a "temporary detail," as of January 2016, Bender was still working this detail.  Dancy states that he has not considered returning Bender to his former job as Patient Safety Manager (or any supervisory position) because such decision is the domain of Milligan.

### 5. *Fourteen-Day Suspension Without Pay*

On November 2, 2015, Dancy, relying on the recommendation of HR employee Rebecca Franks and VA Regional Counsel Jeffrey Reeder, suspended Bender for fourteen (14) days without pay, purportedly as a formal discipline for the ALJ's adverse decision on Edoghotu's complaint. This suspension took place twenty (20) months after the ALJ's decision.  Dancy states that Human Resources drafted the letter he presented to Bender regarding the disciplinary suspension, that he

---

[3] The court understands a detail is a temporary assignment of an employee to a different position, usually for a specified period, after which the employee returns to his or her regular duties.  Although the employee has been detailed to a different position, the employee is considered to be occupying his or her regular position, as there is no reduction in the employee's grade or pay while on detail.

**Amended Memorandum Opinion and Order - Page 8**

reviewed no documents to help him reach the decision of suspension, and that he relied on Human Resource's guidance. Dancy testified he had no explanation why no discipline was proposed earlier and can identify no other VA managers disciplined in this same fashion because of an adverse finding on an EEO complaint by an ALJ. The fourteen (14) day suspension deprived Bender of compensation in the amount of $3,700.

### 6. *Bender's PM&R Position Downgraded from GS 12 to GS 9*

Bender learned on September 13, 2016, that his detailed position in PM&R had actually been downgraded from a GS-12 to a GS-9 position in May 2015. Thus, since May 2015, even though Bender is a GS-13, step 7 employee, he is classified and performing the job duties of a GS-9 employee. Staff members are aware of the downgrading of Bender's position, which is publicly embarrassing for Bender. Being a GS-9 with no supervisory duties has harmed Bender professionally. His applications for other positions at the VA or in the private sector have been rejected because of his lack of leadership duties in his current position, and his requests to attend leadership training seminars were denied for similar reasons.

### 7. *Bender's Charges of Discrimination and Lawsuit*

Bender filed EEO Complaints in April 2011, November 2011, February 2013, and May 2014, complaining of harassment, race discrimination, and retaliation. On July 18, 2014, Bender filed this lawsuit. On December 11, 2015, Bender filed his Third Amended Complaint (Doc. 39), the live pleading. It is undisputed that Bender has exhausted his administrative remedies. On December 28, 2015, Defendant filed a motion for summary judgment on all of Bender's claims. The motion has been fully briefed and is ripe for decision.

## II.      Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 323-25; *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).  "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita*, 475 U.S. at 587.  (citation omitted).  Mere conclusory allegations are not competent summary judgment

evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).   Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458.  Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.    Analysis

### A.    Race Discrimination Claims

Defendant moves for summary judgment on Bender's claim that he was subjected to race discrimination in violation of Title VII and the TCHRA.  After setting forth the applicable law, the court will consider the parties' arguments and the summary judgment evidence.

### 1.    Race-Based Discrimination under Title VII and the TCHRA

Federal employees are protected from discriminatory personnel actions based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  Under the TCHRA, "[a]n employer commits an unlawful employment practice if because of race . . . the employer . . . discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment[.]" Tex. Labor Code Ann. § 21.051.  Claims of race discrimination brought under Title VII and the TCHRA are governed by the same evidentiary framework. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n. 2 (5th Cir. 1999); *see also Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (quoting *Mission Consol. Indep. School Dist. v. Garcia*, 372 S.W.3d 629, 633 (Tex. 2012) (internal quotation marks omitted) ("Because one of the purposes of the TCHRA is to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964, [the Texas Supreme Court has] consistently held that those analogous federal statutes and the cases interpreting them guide [the] reading of the TCHRA.")).

A plaintiff may prove employment discrimination with either direct or circumstantial evidence.  *See, e.g., Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005); *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994)).  "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis*, 309 F.3d 893, 897 (5th Cir. 2002) (citation omitted).  If an employee produces evidence that discriminatory animus played a role in the employment decision at issue, the burden

of production shifts to the defendant, who must prove that it would have taken the same action regardless of discriminatory animus.  *Id.* at 896 (citation omitted).

When a plaintiff relies on circumstantial evidence, such as in this case, courts apply the *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) (establishing the three-part procedure for assessing a disparate treatment claim in the absence of direct evidence).  As modified, *McDonnell Douglas* consists of three stages.  First, a Title VII plaintiff must set forth a prima facie case of race-based discrimination.  *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016) (quoting *McDonnell Douglas*, 411 U.S. at 802).  "Establishment of the prima facie case in effect creates the presumption that the employer unlawfully discriminated against the employee."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Second, once the plaintiff establishes a prima facie case, the burden of production shifts to the employer "to articulate some  legitimate, nondiscriminatory reason" for the employment action it took against the plaintiff. *Machinchick*, 398 F.3d at 350.  This is a burden of production, not persuasion, on the employer's part, and it "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  Third, if the employer meets its burden of production, "the presumption of discrimination drops out of the picture, and the employee must offer some evidence that the reason proffered was a pretext for discrimination, or that a 'motivating factor' for the employment decision was the plaintiff's protected characteristic." *Rogers*, 827 F.3d at 408 (internal quotation marks and citations omitted);[4] *see also Reeves v. Sanderson Plumbing*

---

[4]  The TCHRA similarly provides that an employee may prove unlawful discrimination by showing that a "motivating factor" in the employer's decision was the employee's protected characteristic.  The TCHRA provides:

> (a) Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that race, color, sex, national origin, religion, age, or disability was a *motivating factor* for an employment practice, even if other factors also motivated the practice, unless

*Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253) ("Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against plaintiff remains at all times with the plaintiff.'").

### 2.  Bender's Race Discrimination Claims

Bender contends that the VA discriminated against him on the basis of race, citing the following incidents:

(1)  he was paid less than Caucasian employees in the same Patient Safety Manager position;

(2) his retention incentive, equal to 15% of his pay, ended in December 2011;

(3) he received lower-than-deserved performance ratings in 2011, 2012, and 2013;

(4) staffing levels in his department were frozen, causing him to have to work unpaid overtime to get the job done;

(5) Doskocil issued him a performance counseling memorandum on September 30, 2011, relating to his interaction with a subordinate, Felicia Edoghotu; and

(6) he was detailed to a non-supervisory position in March 2014 after an adverse finding against him in an EEO case brought by a subordinate.[5]

---

race, color, sex, national origin, religion, age, or disability is combined with objective job-related factors to attain diversity in the employer's work force.

Tex. Labor Code Ann. § 21.125(a) (emphasis added).

---

[5] Although Bender included several other alleged instances of race discrimination in his pleadings, in his brief submitted in opposition to Defendant's Motion for Summary Judgment, he concedes that the following three alleged incidents of race discrimination do not constitute adverse employment actions under Fifth Circuit law: (1) Doskocil and Milligan denying him an opportunity to attend training; (2) being prevented from giving performance awards to his employees; and (3) Milligan's requirement that he attend individual meetings with members of the "Quad." *See* Pl.'s Resp. Br. 38 (Doc. 50).  Bender also makes clear that he is not relying on the instance of Carroll calling him a "house nigger" to support his Title VII disparate treatment race discrimination claim. *Id.* at 37 n.227.  In light of Bender's concessions and clarifications, the court will grant Defendant's Motion for Summary Judgment on Bender's disparate treatment race discrimination claims based on these instances.

**Amended Memorandum Opinion and Order - Page 14**

a.     *Bender's Prima Facie Case*

To establish a prima facie case of disparate treatment racial discrimination, the plaintiff must provide evidence that: "(1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 269 (5th Cir. 2009)).

Defendant does not dispute that Bender has satisfied the first two elements of his prima facie case, and concedes that Bender has satisfied the third element of his prima facie case as to two of the above-listed incidences, namely, his contention that he was paid less than Caucasian employees, and that his retention incentive was terminated, as these are adverse employment actions. Defendant disputes that Bender has satisfied the third prong as to the remaining incidents listed directly above. Defendant also argues that Bender has failed to satisfy his prima facie case as to the fourth element, that is, that he was treated less favorably than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *See* Def.'s Summ. J. Br. 20 (Doc. 44) ("[F]or the alleged two incidences that affected Bender's compensation and would stand as adverse employment actions, Bender cannot show that he was treated less favorably than were the other similarly situated Caucasian employees, under nearly identical circumstances.").

i.     *Adverse Employment Action*

An adverse employment action in the context of a race discrimination claim means an "ultimate employment decision," such as "hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007). Title VII does not cover "every decision made by employers that arguably might have some tangential effect upon those

ultimate decisions." *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570. 575 (5th Cir. 2003) (citation omitted).

Other than Bender's contention that he was paid less than Caucasian employees, and that his retention incentive was terminated, the court agrees with Defendant that the remaining incidents upon which Bender relies to support his race discrimination claim are not adverse employment actions as interpreted by the Fifth Circuit in the context of a Title VII disparate treatment case. These instances are: Bender's receipt of lower-than-deserved performance ratings in 2011, 2012, and 2013; the freezing of Bender's staffing levels in his department, causing him to have to work unpaid overtime to get the job done; issuance of a performance counseling memorandum by Doskocil relating to Bender's interaction with Edoghotu; and denial of a non-supervisory position in March 2014 after an adverse finding against him in an EEO case brought by a Edoghotu.  These events do not rise to the level of adverse employment actions necessary to support an employment discrimination claim, as they have only a tangential effect, if any, on ultimate employment decisions. *See McCoy*, 492 F.3d at 559-560; *see also Hart v. Life Care Ctr. of Plano*, 243 F. App'x 816, 818 (5th Cir. 2007) (per curiam) (holding that an employee's being assigned more difficult tasks than Hispanic workers did not constitute an adverse employment action for purposes of employee's Title VII discrimination claim); *Martin v. Kroger*, 65 F. Supp. 2d 516, 536, 539 (S.D. Tex. 1999) (holding that increased workload and negative performance evaluations, even if undeserved, do not constitute adverse employment actions for purposes of employee's Title VII discrimination claim).  Further, to the extent Bender asserts in his response brief that these incidences negatively affected his compensation, Bender offers no evidence other than his own belief, which is insufficient, absent more, to meet his burden of successfully opposing a motion for summary judgment. Unsubstantiated assertions, improbable inferences, conclusory allegations, and unsupported speculation are not

competent summary judgment evidence.  *See Forsyth*, 19 F.3d at 1533; *Eason*, 73 F.3d at 1325; *see also Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quoting *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) ("This Court has cautioned that 'conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy' the nonmovant's burden in a motion for summary judgment.")).

<em>ii.       Similarly Situated Comparators</em>

Defendant contends that, as to those two instances that are adverse employment actions, it is entitled to summary judgment because Bender fails to satisfy the fourth element of his prima facie case, that he was treated less favorably than were the other similarly situated Caucasian employees, under nearly identical circumstances.

With respect to Bender's claim of pay disparity with other patient safety managers who were not African American, Defendant argues that these employees were not similarly situated or "nearly identical" because they were employed under the authority of Title 38 of the United States Code, and Bender was employed under the authority of Title 5 of the United States Code.  In response, Bender provides the court with the Declaration of Patricia Barth, the Network Human Resources Manager for VISN 17, as well as portions of her deposition transcript, in which she explains that regardless of whether hired under Title 38 or Title 5, the patient safety managers performed essentially the same job, and that facilities employing the Title 38 managers are encouraged to convert them to Title 5 managers.  Pl.'s App. 378-84.  Thus, the court rejects Defendant's argument that Bender has failed to produce evidence of similarly situated comparators, under "nearly identical" circumstances.

With respect to termination of his retention incentive, however, the court determines that Bender has failed to provide any competent summary judgment evidence that similarly situated comparators, namely, other patient safety managers (whether hired under Title 38 or Title 5) who

were receiving retention incentives, kept them after Bender's incentive had been removed.  The court

rejects Bender's attempt to compare himself to all VISN 17 employees, as they are not all similarly

situated.  Thus, the court concludes that Bender has failed to satisfy the fourth element of his prima

facie case with respect to the termination of his retention bonus.

> b.    *Defendant's Legitimate, Nondiscriminatory Reason*

Having determined that Bender produced evidence sufficient to satisfy his prima facie case

of disparate treatment based on race with respect to being paid less than other patient safety

managers who were not African-American, the burden of production shifts to Defendant to articulate

a legitimate, nondiscriminatory reason for this difference.

Defendant has satisfied its burden of production, providing the court with evidence that the

employees hired under Title 38 were registered nurses and, as such, their salaries were set by the

Nurse Professional Standards Boards at the VISN 17 medical centers where the nurses worked, based

on their qualifications and credentials.  VA App. 17.  Bender, not a registered nurse, was hired under

Title 5, under which employees are compensated according to the General Schedule pay scale

published by the United States Office of Personnel Management.  *Id.*   The grade levels for Title 5

employees are initially determined by the VISN 17 Conditional Classification Unit, which receives

no input from the Nurse Professional Standards Boards.  *Id.*

> c.    *Pretext*

As Defendant has met its burden of production, "the presumption of discrimination drops out

of the picture, and [Bender] must offer some evidence that the reason proffered was a pretext for

discrimination, or that a 'motivating factor' for the employment decision was the plaintiff's protected

characteristic."  *Rogers*, 827 F.3d at 408 (internal quotation marks and citations omitted); *see also*

*Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253) ("Although intermediate evidentiary

burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against plaintiff remains at all times with the plaintiff.'").

As proof of pretext, Bender argues that Milligan's failure to correct the pay disparity between Title 5 and Title 38 patient safety managers is evidence of pretext. Bender, however, presents no competent summary judgment evidence that Milligan, and not the Nurse Professional Standards Boards at the VISN 17 medical centers where the nurses worked, set the pay for patient safety manager hired under Title 38 or of VA policies allowing such changes by Milligan. For these reasons, the court determines that Bender has failed to raise a genuine dispute of material fact that Defendant's proffered reason for any pay disparity among patient safety managers was a pretext for unlawful race discrimination. In other words, Bender has not shown that he was the victim of intentional race discrimination. Accordingly, Defendant is entitled to judgment as a matter of law, and its motion for summary judgment on Bender's disparate treatment race discrimination claim will be granted.

### B.      Retaliation Claims

The court now considers whether summary judgment is proper as to Bender's Title VII and TCHRA retaliation claims.

It is "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice" under Title VII, or "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C.

§ 2000e-3(a); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001).[6]  Whether the

employee opposes an unlawful practice or participates in a proceeding against the employer's

activity, the employee must hold a reasonable belief that the conduct he opposed violated Title VII.

*Long v. Eastfield Coll.*, 88 F.3d 300, 305 (5th Cir. 1996).

To establish a *prima facie* case of retaliation, a Title VII plaintiff must show that: (1) he

engaged in a protected activity; (2) he experienced an adverse employment action following the

protected activity; and (3) a causal link existed between the protected activity and the adverse

employment action.  *McCoy*, 492 F.3d at 556-57 (footnote and citation omitted);  *Montemayor v.

City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)*; Mota v. Univ. of Texas Houston Health Sci.

Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001).  The establishment of a *prima facie* case gives rise to an

inference of retaliation.  *Montemayor,* 276 F.3d at 692.  This inference, in turn, shifts the burden of

production to the employer, who must then articulate a legitimate, nondiscriminatory or

nonretaliatory reason for the challenged employment action.  *McCoy*, 492 F.3d at 557.  Once the

employer articulates such a reason, the inference of retaliation raised by the *prima facie* showing

drops from the case.  *Montemayor,* 276 F.3d at 692.

At this juncture, the plaintiff bears the burden of establishing that the employer's stated

reason is a pretext for the real retaliatory purpose.  *McCoy*, 492 F.3d at 557 (citation omitted).  "Title

VII retaliation claims must be proved according to traditional principles of but-for causation, not the

lessened causation test stated in § 2000e-2(m).  This requires proof that the unlawful retaliation

would not have occurred in the absence of the alleged wrongful action or actions of the employer."

---

[6] The TCHRA prohibits an employer from retaliating against an employee for engaging in certain protected
activities. Tex. Lab. Code § 21.055.  Protected activities consist of: (1) opposing a discriminatory practice; (2) making
or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner of investigation,
proceeding, or hearing.  *Id.*; *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 647 (Tex. App.— Houston [1st
Dist.] 2015, no pet.).

*University of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2533 (2013).[7]  If the employee fails to prove, or raise a genuine dispute of material fact, that the employer's real reason is a pretext for its allegedly retaliatory conduct, the defendant is entitled to summary judgment.  *See McCoy*, 492 F.3d at 561-62.

Unlike in the Title VII discrimination context, an adverse employment action in the retaliation context is not limited to ultimate employment decisions, such as hiring, granting leave, discharge, promotion, and compensation.  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006); *McCoy*, 492 F.3d at 558.  Consistent with this view, the Supreme Court has held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory action "materially adverse" in that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quotation marks and citation omitted).  In evaluating whether actions are materially adverse, the Supreme Court in *Burlington Northern* went on to hold that "petty slights, minor annoyances, and simple lack of good manners will not" deter or dissuade a reasonable employee from making or supporting a charge of discrimination, and therefore they do not constitute conduct that is "materially adverse." *Id.* at 68.

In support of summary judgment, Defendant argues that Bender has failed to establish a prima facie case, that for each adverse employment action Defendant has a legitimate, nonretaliatory reason for its implementation, and that, in any event, Bender has failed to produce evidence

---

[7] The Fifth Circuit recently noted a circuit split "regarding whether the Supreme Court's holding in [*Nassar*] requires a plaintiff to show but-for causation as part of [his] prima facie case of retaliation, or only at the third step of the *McDonnell Douglas* framework" to rebut an employer's legitimate stated reason for the adverse employment action. *See Smith v. Board of Supervisors of S. Univ.*, 656 F. App'x 30, 33 n.4 (5th Cir. 2016) (and cases cited therein).  The Fifth Circuit has not yet decided this issue.  Further, the court acknowledges a lack of authoritative decisions on whether the "but-for" standard of causation enunciated in *Nassar* applies to federal-sector Title VII claims, rather than the more lenient "motivating factor" standard, but need not reach this issue because the evidence in this case, viewed in the light most favorable to Bender, is sufficient to satisfy either standard.

sufficient to raise a genuine dispute of material fact that the reasons proffered by Defendant are a pretext for retaliation.

Defendant's argument is not supported by the evidence or fails to take into account that the court must construe all evidence in the light most favorable to Bender. As a preliminary matter, protesting what an employee believes in good faith to be a discriminatory practice is protected conduct. 42 U.S.C. § 2000e-3(a). It is undisputed that Bender engaged in activities protected under Title VII and that the various supervisors, human resources personnel, VA counsel, and others with decisionmaking authority were aware of his protected activity. Defendant has offered a facially legitimate reason for detailing Bender and suspending him without pay (the adverse ALJ decision), as well as other adverse employment actions that would suffice to dissuade a reasonable worker from making a charge of discrimination, but it has failed to demonstrate that Bender cannot produce evidence to support his claim.[8] To the contrary, Bender has provided sufficient circumstantial evidence such that a reasonable jury could conclude that he was detailed from his supervisory job and suspended without pay, and subjected to the various other adverse employment actions of which he complains, because he repeatedly complained about discrimination at the VANTHSC. Further, Bender has provided evidence that casts doubt on Defendant's reliance on the ALJ's adverse decision, including, among other things, inconsistent reasons given by decisionmakers involved in the implementation of the adverse employment actions.

---

[8] Of the adverse employment actions Bender cites to support his retaliation claim, the court agrees with Defendant that the following are not adverse employment actions even after *Burlington Northern*: exclusion from meetings; denial of advance leave; loss of computer privileges; loss of a key; the order to attend meetings with all members of the Quad; and Milligan's disparaging comments to Bender's new supervisor. Moreover, Bender does not counter in his response that these incidents are adverse employment actions. In light of Bender's failure to dispute that these incidents constitute adverse employment actions, and after considering applicable law, the court will grant Defendant's Motion for Summary Judgment on Bender's retaliation claims based on these instances.

**Amended Memorandum Opinion and Order - Page 22**

In light of this evidence and drawing all inferences in Bender's favor, a reasonable jury could conclude that Defendant's proffered reasons are a pretext for retaliatory conduct. Otherwise stated, the deposition transcripts and other summary judgment evidence before the court, viewed in the light most favorable to Bender, demonstrate the existence of a genuine dispute of material fact regarding whether Bender was transferred to a nonsupervisory role, suspended without pay, and subjected to other adverse employment actions of which he complains, in retaliation for engaging in protected activity. A reasonable jury could conclude on the basis of the summary judgment record that Bender engaging in protected activity was a but-for cause for the adverse action taken by Defendant.[9] This is sufficient to create a genuine dispute for trial and, therefore, precludes summary judgment on Bender's Title VII and TCHRA unlawful retaliation claims. *See Matsushita Elec. Indus.*, 475 U.S. at 586. Accordingly, Defendant's Motion for Summary Judgment on Bender's retaliation claim will be denied.

### C.     Hostile Work Environment Claims

To establish a *prima facie* case of hostile work environment based on race, an employee must raise a genuine dispute of material fact or prove: (1) that he belongs to a protected class; (2) he was subject to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (Title VII and Chapter 21). The fifth element need not be established

---

[9] Moreover, under the TCHRA, the standard for stating a retaliation claim is whether engaging in the protected conduct was a "motivating factor." *See* Tex. Labor Code Ann. § 21.125(a). As the "motivating factor" standard is less stringent than the "but for" causation standard, genuine disputes of material fact necessarily exist as to Bender's TCHRA retaliation claims.

if the harassment is allegedly committed by the victim's supervisor.  *Celestine v. Petroleos de Venuzuella SA*, 266 F.3d 343, 353-54 (5th Cir 2001); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

The fourth element of the test is met only if the harassment was "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Ramsey*, 286 F.3d at 268 (citations omitted).  If the conduct at issue was not severe or pervasive, the employer cannot be held vicariously liable for the supervisor's actions.  *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002).  To be actionable, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher*, 524 U.S. at 787 (addressing sex discrimination) (citation omitted); *see also Johnson v. Uncle Ben's Inc.*, 965 F.2d 1363, 1372 (5th Cir. 1992) (addressing race-based harassment).  To determine whether an environment was objectively offensive, courts consider the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance.  *Faragher*, 524 U.S. at 787-88; *Ramsey*, 286 F.3d at 268 (same).  This totality of the circumstances inquiry relies on "[c]ommon sense[] and an appropriate sensitivity to social context."  *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998).

Even when a hostile environment is shown, the plaintiff must establish that the workplace environment had the effect of altering the terms, conditions, or privileges of his employment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir. 1993).  "Not all harassment will affect a term, condition, or privilege of employment."  *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999) (citation omitted).  The

"mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee[ ] does not sufficiently affect the conditions of employment." *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Title VII's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends but does not hinder an employee's performance. *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996).

In the Complaint, Bender originally alleged ten incidents of race-based hostile actions. In opposition to Defendant's motion for summary judgment, however, he submits evidence of, and narrows his claim to, three race-based hostile actions.

First, Bender presents evidence that he was called a "house nigger" by Carroll during a meeting on November 21, 2011, of the VA senior leadership team. Milligan, Bender's direct supervisor, was at the meeting and did nothing to reprimand Carroll. Though Milligan denies hearing the racial slur, three other meeting attendees—McCall, Dancy, and Rice—heard Carroll call Bender a "house nigger." Pl's App. 239-40, 354-55, and 377. McCall also testified that the "word is used around here loosely." *Id.* at 355.

Second, Bender heard Milligan and others discussing a "monkey book" before the November 21, 2011 meeting. Rice, an African-American female, later filed an EEO complaint based on Carroll's use of the term "house nigger" and also complained that, instead of reprimanding Carroll, Milligan was joking with another meeting attendee, making racist comments about reading a book called "The Monkey." *Id.* at 377.

Third, on certain occasions, when Sandles, an African American employee, was late to the morning report meeting, Bender heard Milligan inquire of the group: "Where is that boy Sandles? I am looking for that boy." *Id.* at 14, 500. Bender did not hear Milligan refer to any non-African-American employees as "boy." *Id.* at 500. While the court believes that most reasonably intelligent

persons fully understand how degrading, demeaning, and offensive the word "nigger" is, the same is not true with regard to the word "boy." At times, the term is minimized by those who are ignorant of its history and use.

"Boy" was often used during slavery to address an adult Black male rather than call him by his name. The unmistakable intent was to let the Black male know that he was not mature or smart enough to be considered equal to a White male. That prevailing view toward Blacks was also reflected in the original version of Article I of the United States Constitution, in which Blacks were counted as three-fifths of a person for purposes of taxation and representation. This provision was included as a compromise because of competing interests between the North and South. Blacks are referred to as "other Persons." Article I was later modified by the Fourteenth and Sixteenth Amendments to the United States Constitution, which became effective in 1868 and 1913, respectively.

Finally, in late 2011, Gregg, Chief of Staff at the VANTHCS, told Bender that "all the rest of these niggers" would be gone and that Bender would be next. *Id.* at 12, 183. Gregg stated that he would kill Bender if he filed an EEO Complaint. *Id.*

Defendant moves for summary judgment on Bender's hostile work environment claim, arguing that the complained-of treatment was not sufficiently "severe and pervasive," such that it affected a term, condition, or privilege of his employment. *See* Def.'s Summ. J. Br. 17, 19 (Doc. 44). Because the incidents were few and all took place in 2011, Defendant emphasizes the lack of frequency.

First, the correct standard for establishing a hostile work environment requires that the conduct be "severe *or* pervasive" and not the "severe *and* pervasive" standard cited by Defendant. *See Meritor Savings*, 477 U.S. at 67 (emphasis added); *see generally Harvill v. Westward Commc'ns,*

*L.L.C.*, 433 F.3d 428, 434-35 (5th Cir. 2005) (calling into question prior Fifth Circuit decisions applying the wrong legal standard requiring the conduct to be "severe and pervasive," when the Supreme Court has enunciated that the standard is "severe or pervasive").   Finally, the Fifth Circuit cases that use "and" in place of "or" misstate the law as enunciated by the highest Court of the land. Defendant's citation to, and application of, the wrong legal standard is not an "irrelevant distinction," as "the requirement that a plaintiff establish that reported abusive conduct is both severe *and* pervasive in order to be actionable imposes a more stringent burden on the plaintiff than required by law." *Harvill*, 433 F.3d at 435   As stated by the Fifth Circuit, "under a conjunctive standard, infrequent conduct, even if egregious, would not be actionable because it would not be 'pervasive.'" *Id.*   Defendant's reliance on the wrong legal standard alone constitutes a sufficient basis for denying its motion for summary judgment on Bender's hostile work environment claim, as the court is not able to untangle how the more stringent burden placed on Bender to show that the conduct was severe *and* pervasive aids Defendant's argument.

Second, with regard to the infrequency of the harassment, upon which Defendant focuses, it is well-established that "[u]nder the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a Title VII claim." *EEOC v. WC & M Enters.*, 469 F.3d 393, 400 (5th Cir. 2007); *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 163 (5th Cir. 2007) ("An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment."); *see also Harvill*, 433 F.3d at 435 (citing with approval *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998) (holding that a single incident of physically threatening and humiliating conduct can be sufficient to create a hostile work environment)).

In addition to denying Defendant's motion for summary judgment on Bender's hostile work environment claims for relying on the wrong legal standard, for the reasons that follow, the court will deny the motion on the merits, after a full review of the evidence in the summary judgment record and the parties' legal arguments.

Construing the evidence in the light most favorable to Bender, the court concludes that the evidence, considered under the "totality of the circumstances," could enable a reasonable jury to conclude that Bender was subject to a racially hostile work environment. Otherwise stated, Bender has raised a genuine dispute of material fact that the conduct occurring was sufficiently severe to constitute discrimination based on a hostile work environment, notwithstanding that it was infrequent. Applying "[c]ommon sense[] and an appropriate sensitivity to social context[,]" *Oncale*, 523 U.S. at 82, this is not a case where the racial slurs can be written off as "mere offensive utterance[s]." *Harris*, 510 U.S. at 23.[10] This is conduct that is severe enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.

The evidence regarding the racially charged statements and conduct previously set forth, which the court must accept as true at this stage, shows disdain by those in the higher echelons of the VANTHCS for African-American employees. Only by utterly disregarding the meaning of the words stated, or by failing to apply "[c]ommon sense[] and an appropriate sensitivity to social

---

[10] "House nigger" of "house negro" is a "pejorative term for a black person, used to compare someone to a house slave of a slave owner from the historic period of legal slavery in the United States." Https://en.wikipedia.org/wiki/House_Negro. Further, references by Milligan and colleague to reading a booked called "The Monkey," happening at the same meeting where Carroll called Bender a "house nigger," is sufficient for a reasonable jury to conclude that the term "monkey" was being used as a derogatory term for the African-American employees attending the meeting. *See, e.g., Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds by Burlington Northern*, 548 U.S. 53 (2006)) (A triable issue was raised with regard to hostile work environment where, inter alia, supervisors referred to African-American employees as "monkeys"). Finally, a reasonable juror could easily conclude that Gregg's threat to kill Bender, immediately after telling Bender that "all the niggers" would be gotten rid of, is severe enough to constitute a hostile work environment.

**Amended Memorandum Opinion and Order - Page 28**

context[,]" *Oncale*, 523 U.S. at 82, would one fail to comprehend the derisive and offensive nature of the statements.  Further, that Milligan, Medical Directory of VANTHCS and Bender's supervisor, did not correct or reprimand Carroll when he referred to Bender as a "house nigger," suggests to a reasonable person that such language and conduct are "standard operating procedure" at VANTHCS. In addition, it is fatuous for the court to entertain the notion that Milligan would not know that the term "boy," which term he used to describe an African-American employee on more than one occasion,  is derogatory and offensive when directed at an adult African-American male.

Further, viewing all the evidence in the light most favorable to Bender, the court concludes he has also raised a genuine dispute of material fact that the harassing conduct unreasonably interfered with his work performance. *See Harris*, 510 U.S. at 23. ("Title VII comes into play before the harassing conduct leads to a nervous breakdown.  A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.").  Here, drawing all reasonable inferences in Bender's favor, the court concludes that he has produced sufficient evidence to raise a genuine dispute of material fact that the harassing conduct, including being referred to by Carroll as a "house nigger," being told by Gregg that all the "niggers" would be gone and he would be next, being threatened by Gregg that he would be killed if he filed an EEO complaint, and working under a supervisor that references a book titled "The Monkey Book," and refers to adult African-American men as "boy,"caused him to experience fear, anger, stress, and chest pains that unreasonably interfered with his work performance.

Of all factors the court must consider, the only one about which Bender fails to raise a genuine dispute of material fact is the frequency of the conduct.  Frequency, however, is only one

factor and "no single factor is required." *Harris*, 510 U.S. at 23.  The court has weighed this factor and does not find it sufficiently strong to grant Defendant's summary judgment motion.  While infrequent, the evidence shows this is far from a single occurrence.  Indeed, in filing her own EEO Complaint, African-American employee McCall, who was at the November 21, 2011 meeting, and heard Carroll call Bender a "house nigger," also testified that the "word is used around here loosely." Pl.'s App.  at 355.  This statement, along with other evidence in this case, indicates that a culture exists in which high levels of management not only condone and tolerate but also engage in, racially insensitive and offensive conduct.

In sum, Bender has produced evidence sufficient to raise a genuine dispute of material fact that his workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive work environment." *Meritor Savings*, 477 U.S. at 65.  Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's hostile work environment claim will be denied.

## IV.    Conclusion

For the reasons herein stated, the court **grants in part** and **denies in part** Defendant's Motion for Summary.  Plaintiff John Bender has failed to raise a genuine dispute of material fact to support his disparate treatment race discrimination claim under Title VII and Chapter 21 of the TCHRA.  The court, therefore, **grants** Defendant's Motion for Summary Judgment on Plaintiff's disparate treatment race discrimination claims, enters judgment as a matter of law in favor of Defendant on these claims, and **dismisses** them **with prejudice**.

Genuine disputes of material fact do exist, however, with respect to Plaintiff's federal and state law hostile work environment claims.  The court, therefore, **denies** Defendant's Motion for Summary Judgment as to these claims.

**Amended Memorandum Opinion and Order - Page 30**

With respect to Plaintiff's retaliation claim, Plaintiff has failed to raise a genuine dispute of material fact that the following were adverse employment actions: exclusion from meetings; denial of advance leave; loss of computer privileges; loss of a key; the order to attend meetings with all members of the Quad; and Milligan's disparaging comments to Bender's new supervisor.

The court, therefore, **grants** Defendant's Motion for Summary Judgment as to Plaintiff's Title VII and TCHRA retaliation claims based on these acts, and **dismisses with prejudice** these claims. The court **denies** Defendant's Motion for Summary Judgment as to the remainder of Plaintiff's Title VII and TCHRA retaliation claims. Plaintiff's claims of retaliation under Title VII and Chapter 21 of the TCHRA, with the exception of those portions of the retaliation claims the court has dismissed, remain for trial.

Although not raised by Defendant, the court *sua sponte* raises for summary judgment purposes whether Plaintiff, as a federal employee, can assert state law employment discrimination claims against the VA in light of existing Supreme Court and Fifth Circuit precedent. In particular, the Supreme Court has held that Title VII provides the exclusive remedy for claims of employment discrimination filed against the federal government, since "Congress intended [Title VII] to be exclusive and pre-emptive" regarding federal employment. *Brown v. General Servs. Admin.*, 425 U.S. 820, 829, 835 (1976). The Fifth Circuit and lower federal courts in this circuit have applied the Supreme Court's decision in *Brown* to dismiss federal employee's federal and state statutory and common law claims arising out of an employment relationship when these claims were joined with Title VII claims. *See Smith v. Harvey*, 265 F. App'x 197, 200 (5th Cir. 2008) (citations omitted) (affirming dismissal of all federal non-Title VII claims and all state law claims); *Rowe v. Sullivan*, 967 F.2d 186, 189 (5th Cir. 1992) (citation omitted)*; Irwin v. Veterans Admin.*, 874 F.2d 1092, 1095 (5th Cir. 1989) (citation omitted); *Porter v. Shinseki*, 650 F. Supp. 2d 565, 571 (E.D. La. 2009)

(citations omitted).  Further, the court notes that pursuant to the doctrine of sovereign immunity, federal courts do not have jurisdiction over suits against the United States absent a statutory waiver of sovereign immunity.  *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  The court is not aware of any waiver of sovereign immunity by the United States with respect to lawsuits under the TCHRA.

In light of this precedent, the court **directs** Plaintiff to state whether authority exists for him to assert his state-law claims of employment discrimination against Defendant, and to provide the court with this authority in a written response not to exceed **five (5) pages**.  The deadline for Plaintiff to file his response is **March 29, 2017.**  Defendant shall not reply unless directed to do so by the court.  Following receipt of Plaintiff's written response, the court will determine whether its current ruling on Defendant's Motion for Summary Judgment, *supra*, requires amendment or supplementation with respect to Plaintiff's state law employment discrimination claims.

It is so ordered this 23rd day of **March, 2017.**

Sam A. Lindsay
United States District Judge